Well, this is a historic and happy occasion for the Federal Circuit. This is the first time that the Court convenes with Judge Hughes in attendance and participating. I'm sure you will have a chance to hear from him for decades to come, but you know we all wouldn't have him if his parents had not blessed us with him and they are in attendance and we'd like to acknowledge them as well. Now if we could begin with our first case, FRACTUS v. SAMSUNG. Good morning, and may it please the Court. My name is George Riley. I represent the Samsung parties, the appellants in this action. The patents at issue in this case all claim a structure. The structure is a coined term, multi-level structure. That was a term made up by the inventors. And in the patents, the inventors say that this is the essence of the invention. In fact, it's the only thing that distinguishes the invention from the prior art. And a multi-level structure is defined by very specific limitations, five specific geometric limitations, none of which were satisfied by any of the antennas that were used. In a series of errors, all 51 antennas that were accused were found to infringe. But if we were to change the construction of multi-level structure in the means that you advocate, which would include shapes at each level being grouped in a manner similar to the basic elements, is that the construction you're advocating? That is one of the errors that that second level of detail wasn't construed. Well, I guess the difficulty I'm having is how a fact finder, the jury in this case, would be able to reasonably interpret and apply that claim language. With an appropriate construction, I believe it would. Well, okay, so let's look at the one we're talking about. If we say grouped in a manner similar to the basic elements, that's what I think you advocated. That is one of our points. Okay. How do you apply that? Every illustration, all 66 diagrams in the patent clearly apply that. Each upper level structure is similar to the lower level structure and is symmetrical. And that was the very basis on which the patent was issued. But aren't those drawings exemplary? I mean, they're just examples that are put up, so you're asking us to limit the construction of this to just the drawings in the patent? No, the term multi-level structure was coined. And so we have to look to the specification, which also discusses this feature. At both column two and column four, there is a discussion. But the spec doesn't say, and this is the definition, it gives drawings which are examples. It very clearly says that a characteristic of a multi-level structure is it has two levels. Underlying polygons must all be the same polygons, and I'd like to discuss that limitation. And an upper level structure, which is symmetrical, which is similar to the underlying structure. Right. The word symmetrical never appears in the specification. But it is illustrated in every single figure. Well, why don't you, but means I'm right. It never appears in the specification. That is correct, Your Honor. But it is illustrated in every single figure. Do you think symmetrical and similar mean the same thing? Because you're talking, I mean, a lot of this, the word, the terms seem to be used interchangeably at times, at least, in your briefing and in your comments below. Is that your view, then, that the two are the same? Yes, with regard to the nature of the underlying polygons. What about figure 5.8? You said every figure shows symmetry. What about 5.8? 5.8 is three separate multi-level structures. Each of those multi-level structures But I don't see any symmetry there. shows symmetry. We've illustrated that in our brief with an axis that shows that those hexagonal figures are very symmetrical. But we don't even need to get to that issue because there was a basic error in that all polygons must be of the same type. There is not a single antenna that was at issue in which the underlying polygons were of the same type. There were a mixture of different kinds of shapes, highly irregular shapes, shapes with curved edges, straights with 12 sides. Are you talking, then, about the other claim construction issue we have here, which is whether a polygon can have a curved side? Is that what you're talking about or are we still talking about? We're not talking about the multi-levels. We're talking about the polygons must all be of the same type. And in this case, that limitation was completely ignored in the evidence. And we know that in column 2, line 32, and in column 4, line 44, where the inventors very specifically say that same type means things like a triangle, a square, a hexagon, what we would understand to be a same type, not merely a number of sides. Practice, in presenting its case, argued that the two mean the same, same number of sides, same type of polygon. But that was not the claim construction that was given to the jury, and it's certainly not what is required by the patent. Can I ask you, just going, then, to the other issue that you raised, the other claim construction issue, which is polygons and using one side of it does not have to be straight? Correct. There's a dispute in the parties that we don't know. Often, by the time a case gets to appeal, people have sorted out the numbers and what infringes and what doesn't. And here, there would be a major effect on the accused product, and your friend's argument, which is just a couple. Do you know what I'm referring to here, and can you shed any light on that dispute? Yes, and it's a fundamental dispute about the sufficiency of the evidence. And that is because practice was permitted, over objections, to introduce what was called a polygon decomposition method. Their expert, Dr. Long, drew a series of arbitrary four-sided figures on underlying parts of antennas that had multiple sides. He would take a 12-sided object and draw four sides on it. And it was through that process that they claimed that they could prove... That multiple-sided because of the connectors that gave it grooves and ellipses here and there? Sometimes it would be the actual sides of the underlying object that he would ignore. Sometimes it would be curves and divots that he would ignore. But that was dealt with rather clearly by both Judge Davis and the jury, wasn't it? No, not at all. Dr. Long admitted, Your Honor, that he made up that method. It has no basis in the prior art. It's not suggested, intimated in the patent specification whatsoever. And so we asked him... He's just showing the jury where you find the polygons. But the polygons, the majority of those polygons have to be clearly visible and individually distinguishable. He showed that they are clearly visible by outlining them in front of the jury, and you had a chance to cross-examine him at length. The jury preferred the alternative outcome. But essentially what Dr. Long was permitted to do over objections was to reconstruct the patent. His process was as follows. How was he reconstructing the patent? Because he took the phrase, the 50% perimeter limitation. The patents actually require that a majority of the polygons, more than 50% of the perimeter of the polygon must be free, must not be in contact. And so what Dr. Long did was the following. He said, there are only 10 to 15% of these polygons that are clearly visible. I can only see 10 or 15%. So what I have to do is create, contrive, manipulate the pictures to come up with the remaining polygons. And I believe these are all clearly visible because the way I draw them satisfies the 50% limitation. In other words, he was conflating clearly visible with 50%. If I can draw them so that 50% of the perimeters are open, then the clearly visible limitation is satisfied. But those are separate requirements, both in the specification and in the court's claim construction. Over objection, he was permitted to do that, effectively reconstructing the patent to read out the limitation that the polygons be clearly visible and individually distinguishable. Can I move you on just before your time runs out to the question of damages? Yes. Now, even assuming that we agree with you that there was an improper invocation of the entire market value rule in this case, why is it okay? I mean, you say, well, they haven't cited any cases that talk about harmless error. Leaving that aside, why? I mean, they've pointed to stuff in the transcript, in the record, where this 35 cent number appears. And that is the number that the jury ultimately came up with. And as far as I can discern, the discussion of this 35 cents is not in connection with the overall price of the phones, etc. It's another calculation that's based on the sale price of the antenna between Samsung and practice. Why, notwithstanding the entire market value rule, can we not affirm the jury verdict on that basis? The 35 cent figure is not on its own supportable. But more importantly, this was a clear violation of this court's rulings in both Unilock and Laser Dynamics. This court made very clear in those cases that once the entire market price of the final end product is out of the bag, that it inherently skews the jury's... But what if we can look at the record and say that wasn't the case here? What if the jury is presented with two clear alternatives? You can rely on the $140 price of the phone, and here's how you get to this number. And you can rely on the sales figures, historical sales figures, with respect to the antennas between these parties, and you get to this number. And the jury clearly picks this number. We'd still have to send it back for a new trial because you say we assume that it's infected the overall analysis. Absolutely. That very argument was made in both Unilock and Laser Dynamics. Now, the 35 cents is a royalty, right? It's a 35-cent royalty. And now, there's also evidence in the record that when you started your relationship with Fractus, you were buying these antennas at between 50 and 60 cents. Correct. That would mean that the royalty would be somewhere in the neighborhood of 70 percent? That is correct. And that is, as I said earlier, a royalty that cannot be supported. That strikes one as rather out of harmony with any sense of reasonable royalty, doesn't it? Absolutely. Particularly on an antenna that only one year did Fractus make a profit, and the profit was 1.8 cents. And so we have an imputed royalty which is in no way supported in the industry, in experience, and it would indeed be exorbitant. And I think this is why the court established in Laser Dynamics and Unilock this rule that unless you can prove, which there's no dispute, they did not prove that this particular structure of an antenna was the sole driver of consumer demand. They didn't prove that. So they should never have been permitted to introduce the with the using the 10 percent. Where did that come from? Out of thin air. And that is a separate error. Under Laser Dynamics, if they had proven that this particular structure of an antenna, and again, they did not invent multiband or internal antennas. They claimed to have invented a particular structure. If they had proven that that structure was the driver of consumer demand, then they could have gotten to the $100 million. A minute ago you used the term sole driver. That's not our case law, is it? It says a demand driver, right? A demand driver. But in Laser Dynamics, the court goes on to discuss that it has to be more than just an important part of the product. It needs to be... I think that's true, but it doesn't say it has to be the sole demand driver. No, it needs to be the driver of demand. Okay, thank you. I just wanted... Which was not proven in this here. Sorry, I don't mean to cut into your rebuttal time too much, but could I ask you just one question about willful infringement? Yes. Assuming we find that your invalidity and your anticipation and obviousness defenses weren't particularly reasonable, is there still enough on the claim construction and the infringement issues for us to find that you weren't willful? And how should we weigh those factors? Oh, absolutely. One need not even discuss validity to find that the objective reasonableness test was met in this case. In other words, practice did not meet its burden of proving by clear and convincing evidence that Samsung was objectively unreasonable. And in fact, if the court had stayed with its initial claim construction, there wouldn't have been a finding of infringement. If the court had been faithful to the requirement that all polygons be of the same type, there would have been no infringement. Well, I guess I should have made my hypothetical a little bit clearer. I'm assuming that we're rejecting your appeal on those issues and going with the district court, but I'm just focusing on the willfulness question and whether there's enough there to reverse a finding of willfulness just based upon your defense of claim construction and infringement. Absolutely, because the indication is that the district court initially agreed with our position. And so what better test of objective reasonableness than two judges agreed with our position? They later changed their position. But that is clearly objective reasonable. All right. Thank you, Mr. Riley. You want to save your minute of rebuttal? Yes, thank you. Mr. Nelson. Good morning, Your Honors. May I please the court? I want to start, Chief Judge Rader, with your question about the sales price of the antenna. Where's the demand driver evidence? Well, we can look, for example, at, I believe it's, for example, A860, where Samsung admitted that the antenna technology is, quote, the basis of wireless technology. No, no, that's speaking to function. That's saying that it's important to the function of the phone. And, of course, batteries are important to the function of the phone, displays. I suppose it wouldn't function if I removed one screw in the right place. So it isn't the function we're talking about, it's the demand. Where is there any evidence that consumers bought this phone because it had your antenna in it? Well, we went through studies. This is from A1282 through A1287 of our experts' testimony of all of that. But let's just... No, no, no, just a second. See, there's a fundamental disconnect here. You are citing as demand evidence functionality. That is an incorrect principle because I bet we could poll the consumers in this audience about antennas and they'd be surprised. Well, they'd figure their phone has one, but they would not be able to tell you one distinguishing feature of their antenna as opposed to one in a neighboring phone. If they don't even understand the differences, how are they buying the phone based on that feature? Well, Your Honor, the carriers are the ones who are actually buying the phones in the first instance. And the carriers care very much that there is an internal antenna and multi... No, but just a second. You're trying to get the phone price, $140, as your royalty base. Therefore, you have to go with the consumers of that royalty base product. That's the people behind you in the audience. And you didn't show that any of them bought their phone because of the antenna. The $140 price is the price that the carriers pay for the antennas. That is the carrier's price that they pay. But more importantly, let's assume that the district court abuse... Excuse me, Your Honor. Is that right? I thought in the chart, the $140 was the sale price of the phone. It's the sales price of the phone. Absolutely. And they sell it to the carriers. That's absolutely correct. It is not what consumers pay. The list price for the consumers is $299 or $399 or something else like that. This is the sales price from Samsung to AT&T to Verizon or something else like that. And they're buying it because of the antenna. Very clearly. For example, in 2002... So they're buying it because it functions. Yes. And that's not demand evidence. Any more than the battery or that one screw that I can take out that doesn't function as demand evidence. Samsung contacted Frac Deuce and said that the key feature of their phone was an internal antenna, that the carriers were requiring it. They wanted it because the consumers wanted it. But let's just assume for a second that the district court abused its discretion on that. This case comes in a very different procedural posture than Unilock or Substantial Evidence. And as long as the award itself is not grossly excessive... Well, I just showed you how it was grossly excessive because you can have 35 cents on a product which is sales for 50 cents. That's what, 75% royalty? That is, I believe, the record does not support that the average sales price or that the sales price is just 50 cents. Well, at one point, and then immediately after the patents issued, that sales price rose to $1.58. I want to point this court to... It would still put the royalty rate up in the 30% range. It would put that royalty rate in the 30% range for... That's striking, isn't it, on a single component? Well, it shows that... Yes, on a single component. It shows that the price before issuance was the $1.58 immediately after issuance. And I'll point the court to A92, 33, and 34, which is the invoice from November of 2006 with the patent numbers marked on it where the price was raised to $1.20, which at that time equated to $1.58. That was due to the patented increase. When we put sales prices on the exact unit that is being patented, why are we messing with an entire market value exception? The rule is, if you have a single salable unit price, that's what you use. We don't believe, obviously, that the entire market value rule was invoked and we think the district court was correct. The exception was invoked. Fair enough. The exception was invoked. But even if that's true, this is on a JMAL review and post-issuance, on the post-issuance purchase prices, which should be what matters. Certainly, the jury could reasonably conclude that the post-issuance sales were what mattered. That was on $1.58 with $1.25 or so as profit due to the sale because of these patents. And yes, it was awarded on a $0.30 to $0.35 basis. Why is it because of these patents? Well, because that's what, beforehand, the price was on average 50-some-odd cents or the record showed it was $0.65 for the Samsung sales. Immediately after, that price went up because of the patents, because of the patented technology. But we could use the delta, maybe. The delta of due to the patent itself would be about $1, about $0.95 or so. That is due to the patented technology. And then the question is, well, how much of that is going to be split between the infringer and between the patent holder practicing this? Why would we give a 35% royalty? Well, the question is, what is the value of that technology? And once again, it has to be shown before you can use that, that you were a driver of demand. So let's look, then. All you've shown us is that, well, we were essential to function, which is the wrong test. Why don't we send it back because the wrong test was used? Well, because again, we are on a JMAL review about whether there is substantial evidence in the record. And it's not just the sales price. The jury also heard that the licenses which came in without objection, in fact, they were an important part of Samsung's rate and calculation, that those licenses were between $0.22 and $0.84 per antenna. Some of them were for past licenses only. So it's not just the fact that we have the sales price. It's not just the fact that we have the evidence that we've been talking about. We also have the settlement licenses admitted without objection. Samsung doesn't even address those licenses, at least in their opening brief. They dismiss them in their reply brief because they say, well, they're not relevant. But they were a critical feature of their own damages model, and they came in as settlement licenses here for between $0.22 and $0.84. Based upon the units sold, many of them were past licenses. So just on that basis, again, under RightHeight and Versada and the other cases, the question is whether, was it grossly excessive based upon their evidence in the record, and $0.35 on something that evidence was that this technology, these patents were critical to having a multiband internal antenna. That's what was driving the value of these patents. And the patents, yes, but of the phone in general, the entire market value rule is the question you have to answer. And I've heard nothing except you arguing we were essential to the phone's function. Well, that is not demand driver evidence. I don't think that that is correct because we did also rely, again, we relied on other evidence. And I think the district court's opinion- What is the evidence that the people behind you bought their phones because of the antenna? Well, look, for example, on page A, 1283 to 84 of the record. 1283 to 84. The district court, our expert, discussed a marketing material from mobile phone manufacturers about the internal antenna as a key feature. This is assuming that, of course, we're not dealing, that it's not already justified by the sales price and the settlement licenses, looking solely about that. But the 1283 to 1284, there was also information from the carriers that they want and require internal multiband antennas. That's when Samsung contacted Fractus. They wanted to have it because internal antennas themselves were the key feature that was allowing them to sell the devices. So that is why the 10%, the value that it's created, that of course enable a lot of the other features on the phone. But we're not trying to get, we are not seeking a price on $140. It is not a percentage royalty here. It is a royalty that is a per unit royalty that did not deviate based upon the sales price at all. But the evidence presented to the jury very forcefully was the 40 to 60 cents, which you kept on repeating and tying it to the $140 price. So how are we, so you're saying that in hindsight, we can look at this and we can go comb through the record and find independent support, independent of the arguments made with respect to the 40 and 60 cents tied to the 140, and therefore we should affirm it? Is that your argument? Yes, that is one of the arguments. But I also disagree with some of the premise, which is that there was, we did not argue, for example, on the profit of the $1.58. It was very much a critical part. You can look, for example, at the closing statement. I believe that's at 1878, which is where Samsung quotes us by saying, by quoting the entire market value price. But immediately after that, immediately after that, we also discussed the fact that what the profit for these very antennas were, which was on the average post patent issuance was $1.15 profit that we made. This is sales that we made to the defendant here in that case. We said, look, based upon all the evidence in the record, based upon the profit that we had, that we made on those sales post issuance, based upon... But that's the lost profits rule, in which case you'd also have to prove to us that you would have made every sale that was made instead to the infringer. We're not seeking $1.15 by any means. Absolutely, that's true if we were seeking a lost profits case. There is sufficient evidence in the record to know that the value of these patents issuing was close to $1. The question is how you split that up. And the evidence in the record looking at... Yes, you can look at the importance of the antennas. You can look at what Samsung said about it being the key feature in the marketing materials. And you can look at the evidence of the settlement licenses. Yes, Your Honor. Can we move on to willfulness? Yes, please. And I do want to address Judge Hughes' question as well, because I think it's... Go ahead. But please. No, well, his question had to do with willfulness, so I wanted to address that. Judge Hughes, there is a misstatement that Samsung has made in its opening briefing and continues to make, which is that the district court originally ruled with them. That is not the case. And I would point you to A124 and A125 of the district court's original claim construction ruling where it cited the claims of the 208 patent that a portion of a circle is one side of the patent. And so their arguments on infringement have no support in the specification. And it was not some change that the district court stated. That's just not what the record shows. Yeah, but that's not... They don't have to show that in order to... No, but I do want to correct that mistake because they have kept... But could I just ask you the question I asked? Just assume that I agree with you on infringement and that I also agree that the anticipation and validity obviousness defenses are somewhat weak. This is not my conclusion, obviously, but just hypothetically, if I find that the claim construction issue is very, very close and very hard, and honestly, it is very hard, then how do I balance what I think would be a very reasonable defense on the claim construction with less reasonable defenses on the other side? And where's the line on that? Is it enough that part of their case was really good and part of their case was less good for me to find no willfulness? In all fairness, Your Honor, under Bard, I think that if there is an objectively reasonable defense that under my reading of Bard, that if they have an objectively reasonable defense, we disagree with that, obviously, but if there is an objectively reasonable defense, the willfulness verdict... In other words, if claim construction was closed and we think objectively reasonable, but given the claim construction infringement validity, all that stuff is frivolous, we still would find no willfulness. I think that is the best reading of Bard. I appreciate it. And I think that before Bard, it was a different circumstance. And Bard issued after this, right? The timing was a little... The jury verdict came back in May of 2011. The district court returned its motion, excuse me, its order on the motions in June 2012, right after Bard. The district court did address Bard in its opinion and discussed it and saw that they were objectively unreasonable. Now, again, we disagree with... We certainly think that for all the reasons that are in the record, that it was objectively unreasonable for many of the defenses. We think that they were all objectively unreasonable. But they don't even challenge this subjective problem. They don't. No, they don't. That's kind of unusual, isn't it? Well, because I do think that that actually should affect whether it's objectively unreasonable here, because that is a critical factor because in judging, it's not just the claim construction, we gave them drawings, patent numbers, describing it, and they are remarkably similar with how what we showed them in terms of what their intent is actually looked like. And so in conclusion, unless the court has other questions, I know we're running out, I don't want to cut this court short, but I do think that the district court spent a lot of time going through this. There was an 80-page opinion that the district court went through, discussing the issues, thoroughly addressing, including Chief Judge Rader on the damages issue, going through the record very carefully and closely because of the number of issues that Samsung raised. We, of course, did not have the full time to raise many of these issues, but the district court went through thoroughly and did address them, spending about 14 pages on the damages issue alone. So we do think that based upon our briefs and also, of course, based upon the district court's opinion, that this court should affirm. Thank you. And I agree, you were fortunate to have one of the finest patent trial judges anywhere in the world. Mr. Bradley. Yes, practice has ignored entirely a basis for reversal, and that is the requirement that all the polygons be of the same type. The patent is very clear that type refers to the basic shape, be it a square, a triangle, or a parallelogram. None of these antennas comprised polygons of the same type. That was a claim construction we asked for. It is a claim construction that we received. With regard to the initial claim construction on polygon, if the court refers to page 8118 of the record, you will see that the district court originally adopted Samsung's construction of the term polygon. That construction was later changed. I would submit that it was clearly objectively reasonable for Samsung to pose a claim construction, which the district court initially adopted after it had been thoroughly litigated. Certainly, our position on same type, clearly visible, and individually distinguishable were entirely objectively reasonable. Judge Rader, the reason we did not discuss the subjective problem is that Seagate makes it very clear it is their burden, practice's burden, by clear and convincing evidence to show that Samsung's position was objectively unreasonable on every possible defense, not just on one. And they failed in that burden. And indeed, same type and clearly visible and individually distinguishable are bases on which this verdict should be reversed. And finally, with regard to the entire market value rule, I believe the questioning shows that all practice could show was that an internal antenna is a key feature. I would submit that is not the correct question. The correct question is, is the patented feature, is the patented feature the driver of consumer demand? And they have no studies, they have no documents that show that a multi-level structure is the driver of consumer demand for a $140 phone. And they began their damages case like that and they ended it arguing to the juries that a 40-cent royalty was reasonable on a $140 phone. So, on that basis, I would submit. Thank you, Mr. Reilly. Our next case is Enright.